E-FILED
Monday, 19 April, 2010  01:28:16 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 08-CR-20038** |
| | ) | |
| **KERIC FRANKLIN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

A bench trial was held in this case on August 17-18, 2009.  The government filed its Trial Brief (#25) on September 4, 2009.  Defendant filed his Trial Brief (#30) on February 22, 2010.  The government filed its Reply (#32) on March 16, 2010.  The case is now fully briefed and ready for judgment.  For the following reasons, Defendant is found GUILTY of Counts 1, 2, and 3 and is found NOT GUILTY of Counts 4, 5, and 6.

## BACKGROUND

Defendant was indicted on two counts of, on or about May 28 and June 13, 2008, knowingly distributing 5 grams or more of a substance containing cocaine base (crack) in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii) (Counts 1 and 2); on or about June 18, 2008, knowingly distributing 50 grams or more of substance containing crack in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii) (Count 3); on July 25, 2005, Defendant did knowingly possess 50 or more grams of a substance containing crack with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii) (Count 4); on or about July 25, 2005, did knowingly possess a firearm in furtherance

of a drug trafficking crime as charged in Count 4, in violation of 18 U.S.C. § 924(c) (Count 5); and

on or about July 25, 2005, Defendant, having been previously convicted of a felony, did knowingly

possess a firearm in violation of 18 U.S.C. § 922(g)(1) (Count 6).  Defendant waived his right to a

jury trial and the case proceeded to a bench trial on August 17, 2009.

At trial, the government relied mainly, in regards to Counts 1-3, on the testimony of Special

Agent Pat Albinger of the Vermilion County Metropolitan Enforcement Group (VMEG) and the

testimony of a Confidential Source (CS).  VMEG is Vermilion County's drug task force.  Albinger

does drug investigations and has worked somewhere between 200 and 300 drug investigations

during his career.

Beginning in January 2008 he was approached by CS, a former drug addict who wanted to

help remedy some of the harm he had seen caused by drug traffickers.  The CS was not facing any

criminal charges or seeking leniency for himself or others.  CS provided Albinger with information

concerning drug sales in Danville, Illinois,[1] including information on Defendant.  CS told agents he

could purchase crack from Defendant.  Before hiring CS, Albinger interviewed him.  Although CS

was a drug user, he was told not to use drugs during his work for VMEG.  CS said he has been clean

from cocaine since mid-2006.  CS's girlfriend also had a pending traffic charge, but Albinger did

not remember speaking with the State's Attorneys Office on her behalf, although he may have.

Albinger knew CS was a convicted felon who had been to the Department of Corrections. CS

claimed he never got anything out of helping VMEG, except $50 and the knowledge that he was

helping to clean up Vermilion County and make up for his past mistakes.  CS was familiar with

Defendant and had been involved in the Danville drug scene.

---

[1]Danville, Illinois is located in the Central District of Illinois, Urbana Division.

-2-

From January to March 2008 CS made three separate purchases of crack from Defendant. On one of these occasions Defendant gave CS a piece of paper with the address of the DeWitt County jail containing the names of Freddell Bryant and Cameron Polansky and asked him to contact them. Bryant and Defendant are both members of the Black P Stones street gang. For these January and March 2008 purchases CS was paid a total of $50 for his cooperation by VMEG. During May and June 2008 CS made three more controlled buys from Defendant for VMEG.

<u>Controlled Buy of May 28, 2008 (Count 1)</u>

On May 28, 2008, VMEG Special Agents Albinger and Derek Hillery met with CS at a location in Danville. Albinger searched CS's person and vehicle and did not find any contraband or currency. The meeting was to set up a controlled purchase of crack from Defendant. Defendant's address was 1228 Garden Drive in Danville. CS was given $400 by the agents to buy drugs. CS was fitted with a hidden audio recording device. Hillery activated the recording device and drove CS to the parking adjacent to 1228 Garden Drive. Albinger followed Hillery and CS to the location, while VMEG Special Agent Pete Miller maintained surveillance on CS as he entered 1228 Garden Drive. Agents observed CS get out of his vehicle and enter 1228 Garden Drive. CS met with Defendant inside the building. Agents, listening via transmitter, could hear CS enter an apartment and speak with Defendant. During the recorded conversation Defendant asked CS "what you got?" to which CS replied "...that four" and Defendant said "four hundred?" CS and agents, based on their training and experience, testified that "four hundred" meant $400. Defendant then said "I got you. Hard right" to which CS replied "I ain't doing soft for a minute." Hard refers to crack, soft to powder cocaine, according to CS and agents. As Defendant handed CS the crack, CS asked "what's this?" and Defendant replied "half," referring to one half ounce of crack. During the conversation

CS gave Defendant $400 and Defendant gave CS approximately one half ounce (14 grams) of crack.

Agents then observed CS leave 1228 Garden and get back into the vehicle with Agent Hillery. Hillery and CS returned to the prearranged location. At the location, CS gave Albinger a clear plastic baggie containing an off-white chunky substance later determined at the DEA North Central Laboratory to be 13.6 grams of a mixture and substance containing cocaine base and sodium bicarbonate (baking soda), which is commonly used to cook powder cocaine into crack cocaine. Albinger searched CS's person and vehicle for contraband and did not find any.

<u>Controlled Buy of June 13, 2008 (Count 2)</u>

On June 13, 2008, Albinger, Hillery, and DEA Agent Christian McGuire met with CS at the same prearranged location in Danville. Agents searched CS's person and vehicle and found no contraband. Albinger provided CS with $900 prerecorded official authorized funds. CS was equipped with a hidden audio recording and transmitting device. Hillery again drove CS to 1228 Garden and McGuire and Albinger followed CS and Hillery to the location while Miller maintained surveillance on the CS.

Again, CS met with Defendant inside the building. CS could be heard over the transmitter speaking with Defendant, with Defendant asking "how much you got?" and CS replying "...that nine" referring to $900. CS asked Defendant "want for just one of them" to which Defendant replied "man, I only want, I only want eight for an ounce," which Albinger and CS said meant that Defendant only wanted $800 for an ounce of crack. Defendant also claimed it "was a drought" and "dry," which Albinger said referred to a shortage of cocaine. Defendant also informed CS that it was "28 with the bag," meaning the crack weighed a full 28 grams with the packaging included.

CS gave Defendant $800 and Defendant gave CS a little less than 28 grams of crack. Agents

then observed CS leave 1228 Garden and get back into the vehicle with Agent Hillery. Hillery and CS returned to the prearranged location. At the location, CS gave Albinger a clear plastic baggie containing an off-white chunky substance later determined at the DEA North Central Laboratory to be 25.7 grams of a mixture and substance containing cocaine base and sodium bicarbonate (baking soda). Albinger searched CS's person and vehicle for contraband and did not find any. CS also gave the agents the $100 he had left over since Defendant charged him only $800.

<u>Controlled Buy of June 18, 2008 (Count 3)</u>

On June 18, 2008, Albinger, Hillery, and DEA Agent Christian McGuire met with CS at the same prearranged location in Danville. Agents searched CS's person and vehicle and found no contraband. Albinger provided CS with $1,800 prerecorded official authorized funds. CS was equipped with hidden audio and video recording devices. Hillery again drove CS to 1228 Garden and McGuire and Albinger followed CS and Hillery to the location while Miller maintained surveillance on the CS.

Upon CS's arrival at 1228 Garden, agents watched the CS get out of the vehicle and enter an apartment inside the building. McGuire and Albinger could hear via the hidden transmitter CS talking with an unverified individual. After some preliminary discussion, Defendant entered the apartment. The recorded video shows Defendant entering the kitchen and standing next to a scale on a counter next to the sink. Defendant prepared and weighed two ounces of crack for CS and then gave CS a bag with the crack (which CS held up to the camera) while Defendant counted the money. Defendant asked CS "how much you get 'em for?" and CS replied "eighteen" referring to $1,800. Defendant told CS "naw, you keep the two hundred. Just give me the sixteen.," meaning he was only going to charge him $1,600 for the two ounces, not $1,800. When CS asked to see the scales,

Defendant replied that "that mother fucker's fifty-three," referring to 53 grams of crack.

CS gave Defendant $1,600 and Defendant gave CS approximately 53 grams of crack. Agents then observed CS leave 1228 Garden and get back into the vehicle with Agent Hillery. Hillery and CS returned to the prearranged location. At the location, CS gave Albinger a clear plastic baggie containing an off-white chunky substance later determined at the DEA North Central Laboratory to be 51.9 grams of a mixture and substance containing cocaine base and sodium bicarbonate (baking soda), which is commonly used to cook powder cocaine into crack cocaine. Albinger searched CS's person and vehicle for contraband and did not find any. CS also gave the agents the $200 he had left over since Defendant charged him only $1,600.

Following the controlled buys, on July 9, 2008, a search warrant was executed at Defendant's apartment at 1228 Garden. Defendant was found inside a bedroom in the apartment and was the only person in the apartment. In the kitchen, near the location where Defendant was seen with the scale and bag of white powder in the June 18, 2008 video, was found a digital scale, often used in weighing out crack, Insolitol powder, commonly used to "cut" cocaine, and a plastic bag containing smaller baggies, commonly used to package crack. In the bedroom where Defendant was found, agents located Defendant's cell phone, which CS had previously used to arrange the controlled buys. Numerous other documents in Defendant's name were found. Also in the bedroom agents found a baggie containing 15.2 grams of marijuana.

None of the agents actually witnessed an illegal drug transaction between CS and Defendant. What they know they learned from the audio and video recordings and CS.

<u>July 25, 2005 Drug and Guns Seizure (Counts 4, 5, and 6)</u>

The government presented the testimony of Freddell Bryant, a fellow member of the Black

-6-

P Stones with Defendant.  According to Bryant, prior to 2005 Defendant followed Bryant, who was a P Stones "general,"to Danville.  Bryant was involved in selling crack cocaine in Danville.  Bryant agreed to help Defendant financially by helping him sell drugs.  Bryant supplied the cocaine to Defendant as a "front."  A "front" was like a loan and Bryant would collect on the "front" at a later date.  In the Summer of 2005 Bryant bought a 9 millimeter (mm) pistol and a small silver gun.  Defendant held the guns for Bryant.  Bryant was facing serious charges and did expect to get something out of his testimony.  Bryant knew nothing about the drugs seized at the Walnut Street address, just the guns were his.

In July 2005, Randy Green, the owner of 706 Walnut Street in Danville, was approached by a young black male he knew as "Carl Thomas," who inquired about renting 706 Walnut.  Green knew "Carl" because Carl was already renting from Green.  Green gave Carl a key to the residence with the agreement that Carl would clean up the residence in lieu of a security deposit. Green testified that "Carl" appeared to be Defendant, but he could not be certain.  Carl never cleaned or took possession of the residence, so Green decided to show the residence to another prospective tenant on July 25, 2005.  Once inside the residence, Green saw what he believed were guns and drugs in a backpack on the floor of the bedroom.  He called police and waited outside for them to arrive.  While waiting he observed a gray van pull up to the residence and a black male enter the residence and return to the van.  He obtained the license plate number from the van and gave it to VMEG agents when they arrived several minutes later.

Green allowed VMEG agents to search the house.  Inside a black backpack was located on the floor of the bedroom of the residence.  Agents seized (1) a 9 mm Ruger pistol and magazine; (2) a Jennings, .380 caliber pistol and magazine; and (3) baggies containing a total of 51.5 grams of

crack.  In the same bedroom agents also found numerous drug packaging materials, a currency counter, and a food saver vacuum sealer.  The back of the house had also been fortified.

While conducting surveillance on the house following the search, agents observed a van arrive at the residence and saw Defendant get out of the van and go inside.  They then observed Defendant come back out and get inside the van and drive away.  As agents followed the van, Green received a phone call from who he thinks was "Carl" asking where his things were, but he also testified that he could not recognize the voice of the caller.  Agents followed the van and eventually pulled it over, arresting Defendant and two others found inside the van.  Agents searched the van and found a set of keys for the 706 Walnut residence under the carpet in the back seat of the vehicle. The Illinois State Police crime lab found a latent print on the Ruger and identified the print as being made by Freddell Bryant.  The crack was also determined to be a total of 51.5 grams.

ANALYSIS

Counts 1, 2, and 3

To convict Defendant of knowingly distributing crack cocaine the government needs to prove the following: (1) Defendant distributed crack; (2) Defendant did so knowingly; and (3) Defendant knew the substance was a controlled substance.  21 U.S.C. § 841(a)(1).  There is no argument made in this case by Defendant that he distributed crack "unknowingly" or that he did not know that crack is a "controlled substance."  Rather, the only question is whether or not Defendant himself ever distributed crack to CS.

First, the court considers the credibility of Agent Albinger and CS.  Agent Albinger is an experienced member of VMEG and an experienced law enforcement officer.  The court had the opportunity to observe Albinger's testimony and in court demeanor.  The court finds him to be

-8-

credible.  Next, the court did have the opportunity to observe the testimony and in court demeanor or CS.  CS testified that he was a recovering drug addict.  He testified that he had taken drugs in the past and had worked in the illegal drug business with various people, including Defendant and Freddell Bryant.  He admitted to prior felony convictions.  However, both Albinger and CS testified that CS got very little out of helping VMEG.  There is no evidence that CS was helped in any pending criminal charges that he or family members may have had, except unclear testimony over a girlfriend's traffic offense.  The most he was compensated was around $50.  CS testified that he became a confidential source because he wanted to help clean up Danville and right some of his past wrongs.  After the transactions at 1228 Garden Drive CS turned over all the drugs and leftover money to VMEG.  Despite CS's past associations, prior convictions, and drug use, the court, after observing CS and listening to his testimony as well as that of Agent Albinger, finds CS to be truthful and a credible witness.

The court believes the evidence against Defendant on Counts 1, 2, and 3 to be overwhelming.  The evidence at trial showed, as testified to by CS and Agent Albinger (both of whom the court believes to be credible), that on all three occasions, May 28, June 13, and June 18, 2008, CS met with VMEG agents at a prearranged location where he and the vehicle he was in were thoroughly searched for drugs and money.  CS was then driven to the apartment building at 1228 Garden Drive by Agent Hillery, where he exited the vehicle and then went to an apartment in the building.  Once in the apartment, he met with Defendant and exchanged money given to him by VMEG for various amounts of crack cocaine.  He then left and was driven back to meet with VMEG agents, to whom he turned over the crack purchased from Defendant along with any leftover money.  He and the vehicle were then thoroughly searched again, and all three times no drugs or money was found.

Further, there are also audio recordings of the first two controlled buys and an audio and video recording of the third. Each recording contains language that the VMEG agents testified was, based on their years of training and experience, indicative of a drug deal. Defendant is on those tapes exchanging drugs for money with CS. Further, Defendant can be seen on the video participating in the drug deal with CS. Defendant argues that the language on the audio recording is vague and that the video is grainy and does not show a drug transaction. However, it was testified that parties to a drug transaction almost never use explicit words that clearly indicate a drug deal. In this case, the language and terms used on the tapes, referring to certain amounts of money exchanged for certain amounts of crack, match up exactly to the testimony of CS and the quantities of drugs and leftover money CS brought back to the VMEG agents following each transaction. Further, even without the audio and video recordings, the court has already found the testimony of CS to be credible. Therefore, the court finds overwhelming evidence of Defendant's guilt as to the transactions of May 28, June 13, and June 18, 2008. Defendant is found GUILTY of Counts 1, 2, and 3.

<u>Counts 4, 5, and 6</u>

Count 4 of the indictment charges Defendant with possession of 50 grams or more of crack with intent to distribute, again requiring the government to prove beyond a reasonable doubt that on or about July 25, 2005, Defendant (1) knowingly possessed crack and that (2) he did so with the intent to distribute it to another person. 21 U.S.C. § 841(a)(1). Here, the government argues that, with regard to Count 4, that there is no dispute the crack seized weighed 51.5 grams and that, combined with the presence of scales, packaging materials, vacuum sealer, currency counter, and a fortified back door, there can be no question that the crack was possessed with the intent to

distribute and that "the only possible defense is a claim that the Defendant did not possess the crack cocaine."

Count 5 of the indictment charges Defendant with possession of a firearm in furtherance of a drug trafficking crime, requiring the government to prove (1) that Defendant committed the crime of possession of crack with the intent to distribute as it is charged in Count 4 and (2) that Defendant knowingly possessed a firearm in furtherance of that crime. 18 U.S.C. § 924(c). Here, the government argues that, since it believes Defendant possessed the crack with the intent to distribute it on July 25, 2005, the only remaining question is whether Defendant possessed the two pistols recovered "in furtherance" of his drug crime. The government argues that the evidence shows the two firearms are semiautomatic pistols, commonly used by drug traffickers; Defendant's possession of the firearms was illegal, as he was a convicted felon, holding the pistols for another convicted felon, Freddell Bryant; each of the pistols had a magazine capable of firing; the pistols were immediately accessible to anyone in the residence, and Defendant was twice seen in the residence the day the pistols were seized; and the pistols were found in the same house as the crack, a drug stash house no less. Also, drug trafficking is a crime very much associated with the use of firearms.

Count 6 of the indictment charges Defendant with unlawful possession of a firearm by a felon, requiring the government to prove beyond a reasonable doubt that (1) prior to July 25, 2005, Defendant had been convicted of a crime that was punishable by a term of imprisonment of more than one year; (2) that one July 25, 2005, Defendant knowingly possessed a firearm; and (3) that the firearm possessed by Defendant had traveled in interstate commerce prior to the Defendant's possession of it on that date. 18 U.S.C. § 922(g).

The court agrees with the arguments put forward by the government regarding Counts 4, 5,

and 6.  The court also agrees that Defendant's guilt on those counts turns on one question: was it Defendant who rented the house, spoke with Green on the phone on July 25, 2005, and entered the house on July 25, 2005.  It is clear from testimony that the law enforcement agents observing the 706 Walnut house on the evening of July 25, 2005, after the home was searched, did see Defendant exit the van and enter, using the keys for the home.  However, the identification of "Carl Thomas," who rented the house from Green and who later called Green on the phone is questionable, at best. During direct examination Green did identify Defendant as Carl Thomas, but his identification was not very strong, he said the Defendant "looks a lot like" Carl Thomas.  Then, on cross examination, he admitted that it had been four years since he saw Carl Thomas, and that he was not certain Defendant even was Carl Thomas.  Further, regarding the phone calls he received after the agents raided 706 Walnut and removed the backpack containing the crack and guns, Green said he "thinks" he talked to Carl Thomas, but also said he did not recognize the voice.  While Freddell Bryant identified the gun recovered as the one Defendant was holding for him, Defendant was never seen in possession of the weapon nor can he be tied to being in the vicinity of the weapon.  The only time where he would have for sure been in the guns' vicinity was when he entered the house following the raid, but by that time the guns and drugs had already been removed by law enforcement agents. Further, the court questions the credibility of Freddell Bryant, a convicted felon facing life in prison who is hoping to get "something" in exchange for his testimony against Defendant.  Further, the fingerprints found on the 9 mm gun belonged to Bryant, not Defendant.

The court agrees with the Defendant's assertion that the government's case on Counts 4-6 is based on Defendant and Carl Thomas being the same person.  Randy Green could not for certain identify Defendant as Carl Thomas.  Without that direct evidence, the remaining evidence that Carl

-12-

Thomas was Defendant, and that the drugs and guns found inside the house at 706 Walnut belonged to Defendant, is circumstantial. That circumstantial evidence is not enough so that the court can say the government proved its case for Counts 4, 5, and 6 beyond a reasonable doubt. Therefore, Defendant is found NOT GUILTY of those counts.

IT IS THEREFORE ORDERED:

(1) Defendant is found GUILTY of Counts 1, 2, and 3 of the Superseding Indictment.

(2) Defendant is found NOT GUILTY of Counts 4, 5, and 6 of the Superseding Indictment.

(3) This case remains set for a status conference on April 28, 2010, at 10:00 am in Courtroom A, so that a sentencing hearing can be scheduled.

ENTERED this 19th day of April, 2010

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE